COURT OF APPEALS
DECISION
DATED AND FILED

September 27, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1028**

Cir. Ct. No. 2019TP225

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

IN RE THE TERMINATION OF PARENTAL RIGHTS TO C.M.M., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

V.

J.D.C., JR.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: ELLEN R. BROSTROM, Judge. *Affirmed.*

¶1 BRASH, C.J.[1] J.D.C., Jr. appeals the order of the trial court terminating his parental rights to C.M.M. J.D.C., Jr. argues that the trial court erroneously exercised its discretion in its consideration of several of the statutory factors for determining the best interests of C.M.M., and did not properly consider placement options. He further asserts that this court should exercise its discretionary authority under WIS. STAT. § 752.35 to grant him a new dispositional hearing, specifically for purposes of obtaining testimony from C.M.M.'s foster parents. Upon review, we reject J.D.C., Jr.'s arguments and affirm.

## BACKGROUND

¶2 C.M.M., who was born in January 2012, is the adjudicated daughter of J.D.C., Jr. In March 2018, the Division of Milwaukee Child Protective Services (DMCPS) petitioned for C.M.M. to be found a child in need of protection or services (CHIPS) after her mother, B.M., contacted the Milwaukee Police Department about domestic violence incidents with her significant other, C.W. B.M. alleged that C.W. had punched his son, punched and choked one of B.M.'s other children,[2] and had also struck that child and C.M.M. with a wooden spoon. B.M. explained that C.W. had been violent toward her for three years. However, B.M. has a long history of being involved in violent relationships, and she expressed no plans to end this relationship.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] B.M. had four biological children at the time of these proceedings, none of whom were residing with her when the petition for the termination of her parental rights to C.M.M. was filed. She also had another child who had died under "unspecified circumstances." Additionally, she was pregnant with her sixth child at that time. B.M.'s parental rights to C.M.M. were also terminated during these proceedings, but B.M. is not involved in this appeal.

¶3      C.M.M. and several of her half-siblings were removed from B.M.'s home.  DMCPS was unable to place C.M.M. with J.D.C., Jr.; he has a history of criminality, and had been in and out of custody since at least May 2014.  He was listed as an absconder at the time C.M.M. was detained, and was subsequently arrested in July and August of 2018 for probation violations.

¶4      Instead, C.M.M. was initially placed with J.D.C., Jr.'s mother, L.R.  C.M.M. was subsequently removed from L.R.'s home, however, and placed in foster care with her siblings, at the request of L.R.  L.R. thought C.M.M. would be happier if she was placed with her siblings, and indicated that she preferred the role of grandparent to C.M.M. rather than being her full-time guardian.

¶5      A CHIPS order for C.M.M. was entered in September 2018, and listed a number of conditions that had to be met before she could be returned to either parent.  The conditions for J.D.C., Jr. included resolving his criminal cases and committing no further crimes, as well as not permitting or engaging in any violence in front of C.M.M.  Regular visitation with C.M.M. was also required.

¶6      J.D.C., Jr. failed to meet these conditions.  He was incarcerated much of the time that the CHIPS order was in effect for committing various violations, including for a domestic violence incident with his girlfriend at the time.  In fact, he was in and out of custody for much of C.M.M.'s life, and had very little contact with her.  He never paid child support for her or engaged in the role of her caregiver.  He attended a few parenting classes that were provided to him by DMCPS but was discharged for inconsistent attendance, and he failed to attend domestic violence counseling sessions.  Furthermore, while C.M.M. was placed with L.R., J.D.C., Jr. had the opportunity to visit with her, but it was reported that he instead would just "drive by" the house and "wave," but not stop.

¶7    In short, it was determined that J.D.C., Jr. "exhibited a pattern of behavior that indicate[d] he could not safely care for [C.M.M.]."  Therefore, a Petition for the Termination of Parental Rights (TPR) was filed in November 2019.  In the petition, the State's alleged grounds for termination included the continuing need of protection or services for C.M.M., pursuant to WIS. STAT. § 48.415(2), and the failure to assume parental responsibility, pursuant to § 48.415(6).  J.D.C., Jr. entered a no contest plea to the failure to assume parental responsibility ground in April 2021, and the matter proceeded to disposition.

¶8    The dispositional hearing took place over several days in April, July, and September of 2021.  At the hearing, the trial court heard testimony from the case manager for the family.  The case manager testified that the foster parents for C.M.M. were an adoptive resource for her.  The case manager further explained that J.D.C., Jr. had not been present for most of C.M.M.'s life, and that he had not attempted to set up in-person visits after he was released from custody.  Therefore, the case manager stated that C.M.M. did not have a substantial relationship with J.D.C., Jr.

¶9    However, the case manager recognized that C.M.M. did have regular contact with some of her paternal relatives, especially L.R.  In fact, the case manager acknowledged that C.M.M. provided conflicting opinions as to where she wanted to live.  The case manager explained that C.M.M. had at times expressed a desire to live with L.R., likely because "her grandmother spends a significant amount of time with her, and grandma's home had been her home for a period of time[.]"

¶10    Additionally, the case manager testified that C.M.M.'s paternal great-grandmother, V.R., had made a request in October or November of 2020 for

4

C.M.M. be placed with her. However, the case manager stated that V.R. was not related to C.M.M.'s siblings with whom she was placed and had substantial relationships. Although V.R. indicated that she was willing to have C.M.M.'s siblings placed with her as well, the case manager testified that V.R. was not a licensed foster parent, and that she had not followed up with the case manager with regard to obtaining a foster care license.

¶11 V.R. also testified at the dispositional hearing. She stated that she had a substantial relationship with C.M.M. and saw her often, usually when C.M.M. was with L.R. However, B.M. testified that she had never seen C.M.M. with V.R. Furthermore, another case worker specifically working with J.D.C., Jr. testified that C.M.M. had a relationship with L.R. as well as two paternal aunts, but stated that C.M.M. had never mentioned V.R. J.D.C., Jr. also did not reference V.R. when he testified regarding visitation with C.M.M.; rather, he noted visitation time with B.M. and L.R.

¶12 In making its determination, the trial court noted that J.D.C., Jr. was "obviously getting [his life] together." However, the court pointed out that he had not made any "significant effort" to "actually get his child into his home," and that he "really hasn't progressed very far in consistently showing up for [C.M.M.] and consistently meeting … her needs[.]" The court opined that the "most salient" thing about this case was how long it had been going on and how little progress had been made by the parents.

¶13 In noting the suggestion of V.R. as an alternative for placement of C.M.M., the trial court stated that this would be a "brand new placement three-and-a-half years into this story." The court further observed that while the

testimony indicated that C.M.M. knows V.R., it did not demonstrate that C.M.M. had "a very intimate relationship with her[.]"

¶14    The trial court then addressed each of the statutory factors for determining the best interests of C.M.M.  In particular, the court noted the amount of time C.M.M. had been in out-of-home placement, stating that it was "a significant period of time" given her age.  The court explained that it considered the "key factor" in this case to be "the need for stability and permanency" and the need for C.M.M. to be "done with this roller coaster," referencing the amount of time this matter had been pending.  The court thus ultimately determined that it was in the best interests of C.M.M. to terminate the parental rights of J.D.C., Jr. and B.M.  This appeal follows.

## DISCUSSION

¶15    On appeal, J.D.C., Jr. asserts that the trial court erroneously exercised its discretion in failing to adequately examine relevant evidence relating to three of the statutory factors when it determined that terminating his parental rights was in the best interests of C.M.M.  "The ultimate determination of whether to terminate parental rights is discretionary with the [trial] court."  *State v. Margaret H.*, 2000 WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475.  We will uphold the decision if the trial court applied the correct standard of law to the facts of the case.  *See id.*, ¶32.

¶16    In making the determination to terminate parental rights, "the best interests of the child is the paramount consideration" for the trial court.  *Id.*, ¶33. The trial court's decision should reference the statutory factors set forth in WIS. STAT. § 48.426(3), and any other factors it relied upon, in explaining on the record

the basis for the disposition. ***Sheboygan Cnty. DHHS v. Julie A.B.***, 2002 WI 95, ¶30, 255 Wis. 2d 170, 648 N.W.2d 402.

¶17    The statutory factors that the trial court is required to consider are:

> **(a)** The likelihood of the child's adoption after termination.
>
> **(b)** The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> **(c)** Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> **(d)** The wishes of the child.
>
> **(e)** The duration of the separation of the parent from the child.
>
> **(f)** Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

WIS. STAT. § 48.426(3).

¶18    The record indicates that the trial court referenced all of these factors with regard to C.M.M. in its decision, and found that the evidence relating to each factor weighed in favor of the termination of J.D.C., Jr.'s parental rights. Indeed, J.D.C., Jr.'s argument on appeal is not that the court did not consider the statutory factors, but rather that it did not adequately examine all of the relevant evidence relating to several of the factors.

¶19    First, J.D.C., Jr. argues that the trial court did not fully consider C.M.M.'s relationship with her paternal relatives and the potential harm from legally severing those relationships, as set forth in WIS. STAT. § 48.426(3)(c). His

argument focuses on the evidence that C.M.M. had a substantial relationship with L.R., her grandmother. In fact, the trial court acknowledged that C.M.M. had a "very meaningful relationship" with L.R.; however, the court also noted that any harm from severing this relationship could be mitigated by the foster parents' intent to continue that relationship, which had been demonstrated by C.M.M.'s regular visits with L.R. during the course of these proceedings. While the law is clear that a termination of parental rights legally severs the relationship between the child and her biological family, the court still has discretion to consider the potential of a continued relationship in its analysis of this factor. *Margaret H.*, 234 Wis. 2d 606, ¶¶29-30.

¶20 J.D.C., Jr. also argues that the trial court erred in its determination that the relationship between C.M.M. and V.R., a suggested alternative placement option, was not substantial. J.D.C., Jr. asserts that the record does not support this conclusion. We disagree. V.R.'s testimony about her close relationship with C.M.M. was not corroborated by any other witness; in fact, there was testimony from several witnesses that they never saw C.M.M. with V.R. or heard C.M.M. mention V.R. Thus, we reject J.D.C., Jr.'s contention that the trial court's conclusion is not supported by the record.

¶21 Next, J.D.C., Jr. argues that the trial court did not properly consider the wishes of C.M.M. in accordance with WIS. STAT. § 48.426(3)(d). Although there was testimony that C.M.M. had expressed a desire to live with L.R., there was also testimony regarding C.M.M.'s substantial relationships with her siblings and how happy she is living with them in foster care. Moreover, L.R. was not a placement option, as she had indicated that she did not wish to have C.M.M. permanently placed with her. With this conflicting evidence, the court observed that C.M.M. was too young to truly understand the concept of adoption under

these "very complex circumstances." Thus, the court did in fact consider the relevant evidence relating to this factor.

¶22     J.D.C., Jr. next asserts that the trial court failed to properly consider placement options for C.M.M. due to its "aversion to relitigating" previous placements. However, such an error is not supported by the record. There does not appear to have been any contested litigation relating to C.M.M.'s previous placement; she had previously been placed with L.R., who voluntarily gave up placement. In other words, there had been no litigation regarding her previous placement, so there was nothing to relitigate.

¶23     The only other proffered alternative placement for C.M.M. was with V.R., which the trial court considered and rejected, as explained above. In fact, the trial court emphasized that the "key factor" in its determination was "the need for stability and permanency" for C.M.M., described in WIS. STAT. § 48.426(3)(f), the final statutory factor. J.D.C., Jr.'s arguments ignore the evidence that points to his failure to make a significant effort to demonstrate his ability to consistently care for C.M.M. and give her a stable, permanent home.

¶24     Indeed, J.D.C., Jr. essentially argues that the trial court should have weighed the evidence differently, such that it would be viewed more favorably toward him. This, however, is not the standard; rather, the trial court is to use its discretion to determine the best interests of the child, based on its consideration of

all of the evidence as it relates to the statutory factors.[3] *See Margaret H.*, 234 Wis. 2d 606, ¶¶27, 32. The trial court properly did so here.

¶25 Given our analysis above, we also reject J.D.C., Jr.'s final argument—that we should exercise our discretion to grant a new dispositional hearing pursuant to WIS. STAT. § 752.35. This statute allows this court to reverse an order of the trial court "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried[.]" *Id.*; *see also State v. Williams*, 2006 WI App 212, ¶36, 296 Wis. 2d 834, 723 N.W.2d 719. However, this discretionary reversal power "is formidable, and should be exercised sparingly and with great caution." *Williams*, 296 Wis. 2d 834, ¶36.

¶26 Based on our review of the record, we conclude that the controversy here was fully tried, and therefore discretionary reversal would be inappropriate. *See id.* Furthermore, with regard to J.D.C., Jr.'s specific assertion that the trial court should have heard testimony from C.M.M.'s foster parents, we point out that J.D.C., Jr. did not call them as witnesses. "It is a fundamental principle of appellate review that issues must be preserved at the [trial] court." *State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727. J.D.C., Jr. provides no justification for this omission, nor does he explain why the foster parents' testimony would be fundamental to his case, especially when there was testimony regarding the intent and actions of the foster parents from other

---

[3] We note that in his initial brief, J.D.C., Jr. also argued that the trial court's analysis of WIS. STAT. § 48.426(3)(e), the duration of the separation of the child from the parent, did not acknowledge the "brevity of separation" between C.M.M. and J.D.C., Jr.'s family. This factor requires consideration of the separation between the child and the *parent*, not the parent's family. *See id.* J.D.C., Jr. conceded this point in his reply brief, and we thus do not discuss it further.

witnesses who were subject to cross-examination. We may decline to discuss issues that are inadequately briefed. *See* ***State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

¶27 Therefore, we conclude that the trial court's determination was properly made in this matter. Accordingly, we affirm its order terminating J.D.C., Jr.'s parental rights to C.M.M.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.